**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

———————————————————— )
**DAVID FLETCHER,** )
           )
        **Petitioner,** )    **Civil No.**
           )    **06-40280-FDS**
    **v.** )
           )
**STEVEN O'BRIEN,** )
           )
        **Respondent.** )
———————————————————— )

**MEMORANDUM AND ORDER ON
<u>PETITION FOR WRIT OF HABEAS CORPUS</u>**

**SAYLOR, J.**

       This is an action by a state prisoner seeking a writ of habeas corpus pursuant to 28 U.S.C.

§ 2254. Petitioner David Fletcher was convicted in Essex Superior Court of six counts of

statutory rape of a child under the age of 16. He then filed two motions for a new trial, both of

which were denied. His conviction and the denial of those motions was affirmed by the

Massachusetts Appeals Court, and the Supreme Judicial Court denied further appellate review.

He then filed a petition for a writ of habeas corpus in this Court.

       Petitioner contends that his conviction was obtained in violation of his Sixth Amendment

rights to the effective assistance of counsel and to confront his accuser. The Massachusetts

Appeals Court considered and rejected both claims.

       This matter warrants unusually close consideration for a number of reasons. First, and as

a general proposition, any prosecution based on allegations of long-ago, unreported child sexual

abuse must be examined with great care. Over the course of several years, or even decades,

evidence typically disappears, witnesses die, and memories fade and become transformed, making cases not only more difficult to prosecute, but also to defend. A conviction may be based on little more than the testimony of the complainant, without supporting circumstantial evidence. Moreover, the natural aversion of ordinary human beings to the sexual abuse of children, and the strong desire to protect victims and punish offenders, may distort or even destroy the normal protections afforded to criminal defendants. A court reviewing such a prosecution must therefore take care to ensure that no injustice has been committed.

Beyond that general concern, this case also presents specific issues based on the performance of petitioner's trial counsel, John Shyavitz. At a minimum, Shyavitz engaged in behavior that was unprofessional, even bizarre. Indeed, Shyavitz was suspended from the practice of law three weeks after the conclusion of the trial, based on a pattern of neglect in other clients' civil cases and a series of misrepresentations to those clients. More significantly for present purposes, he did not utilize all of the exculpatory evidence available to the defense.

The fact, however, that a trial concerned a difficult subject matter, or that trial counsel's performance may have been far from perfect, is not the end of the inquiry. This Court may not simply substitute its own judgments for those of the state courts; to the contrary, it must give their judgments substantial deference. And the issues raised here were litigated in the state courts in considerable detail. The performance of Shyavitz at the trial was the subject of extensive post-trial proceedings, including evidentiary hearings conducted before the trial judge, who made detailed factual findings. The trial judge concluded that his performance had not been constitutionally deficient. That determination, in turn, was upheld on appeal.

Again. this Court may not freely review those decisions, but must require petitioner to

meet a fairly demanding standard before he may obtain federal habeas relief. Specifically, this Court must deny habeas relief unless the state-court decision was contrary to or an unreasonable application of clearly-established federal law, or was based on an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(1), (d)(2).

After careful consideration, and notwithstanding its concerns with the performance of Shyavitz, this Court has concluded that petitioner has not met that demanding standard. The petition will therefore be denied.

## I.  Statement of Facts

The Appeals Court summarized the facts of the case as follows:

> In August, 2000, the victim, then twenty-six years old, told his mother, and later the Hamilton police and a grand jury, that, beginning when he was twelve or thirteen years old (1986 or 1987), first Fletcher (for whom he did odd jobs) and later Johnson (who was subsequently introduced to the victim by Fletcher) engaged in oral and anal sex with him at Fletcher's house in Haverhill and in a "dollhouse" on a property in Hamilton known as the Shane Estate, where Johnson worked as a groundskeeper. The sexual activity occurred frequently until the victim was seventeen or eighteen. The victim was never forced to participate in these activities and never reported them, thinking it was all part of his "friendship" with the defendants. Between the time of the last sexual incidents and the time he spoke to his mother in 2000, the victim experienced personal problems (including alcoholism) and saw various mental health professionals. During one of three hospitalizations during that period, in late 1991, he revealed to certain of those professionals physical and emotional abuse he had suffered at the hands of others when he was a young child, but made no mention to anyone of any sexual relations with the defendants. He testified that it was only as an adult and after he had addressed some of his own problems that he came to perceive that what had happened between him and the defendants "wasn't right" and that he "needed to do something about it."

*Commonwealth v. Fletcher*, No. 05-P-139, 2006 WL 508722, at *1 (Mass. App. Ct. 2006) (unpublished opinion).

## II.  Procedural Background

On November 1, 2000, an Essex County grand jury indicted petitioner for six counts of rape of a child under the age of 16 in violation of Mass. Gen. Laws ch. 265 § 23. A co-defendant, Peter Johnson, was indicted on five counts of the same offense.

On November 24, 2003, a jury in Essex Superior Court found Fletcher guilty of all six counts.[1] The trial court sentenced him to concurrent terms of 14 to 16 years imprisonment on each count, to be followed by 10 years probation on Counts Two, Three, Four, and Five. He timely appealed his convictions to the Massachusetts Appeals Court.

On April 7, 2004, Fletcher moved for a new trial on the ground that his counsel, John Shyavitz, had deprived him of effective assistance as required by the Sixth Amendment to the U.S. Constitution. He argued that Shyavitz—who, unbeknownst to Fletcher, was under investigation by the Board of Bar Overseers during the pendency of the case—did not prepare adequately for trial and did not provide effective or competent assistance. Fletcher also pointed to what he called "numerous failures to object to inadmissible and prejudicial testimony, failure to impeach witnesses with readily available evidence, including police reports and psychiatric evidence, and failure to object to improper closing argument."

On July 15, 2004, Fletcher filed a supplemental motion for a new trial. In his supplemental motion, he continued to assert his claim of ineffective assistance of counsel, but also argued that a new trial was necessary based on newly discovered evidence and various other errors made by the trial judge. He argued that the new evidence concerning the existence of a farm stand, and the dates on which co-defendant Johnson worked at the farm stand, went to a key

---

[1] Johnson was convicted on four counts; a required finding of not guilty was entered as to a fifth count. On two of the rape convictions, Johnson was sentenced to concurrent 10 to 12-year prison term. The court ordered that those sentences run concurrent with two 10-year probationary terms for the remaining convictions.

issue in the case: whether the victim was under the age of 16 during the period of time he contended he was sexually abused by Fletcher and Johnson.

On September 13, 2004, the trial judge held an evidentiary hearing on the ineffective assistance claims raised in the first motion. At the hearing, Fletcher presented testimony from three witnesses: Shyavitz's associate, John Harwood; Johnson's attorney during the pretrial period, Randy Chapman; and Fletcher himself. Attorney Shyavitz did not testify.

On September 27, 2004, following the hearing, the trial judge issued a detailed memorandum and order rejecting the ineffective assistance of counsel claims. Among other things, the judge found as follows:

> The theory of this case was not complex. As Attorney Chapman [who represented Johnson] testified, it was apparent that the primary defense would be to attack the credibility of the sole witness with any direct knowledge, the alleged victim . . . . That was why Attorney Chapman and Attorney Shyavitz agreed to retain the services of private investigator Mulvey. This was an appropriate strategy. In fact, it appears to be the only viable strategy. As in many child rape cases, there were no third party witnesses. This was a case of delayed disclosure by the alleged victim. [The victim] waited over a decade before disclosing these alleged sexual assaults. There was little, if any, evidence to corroborate the alleged victim's allegations. Furthermore, as Shyavitz already knew, there was evidence available (e.g. a prior court ruling that [the victim] had lied in a[n] automobile insurance case and psychiatric records) that indicated that [the victim] was not truthful and suffered from emotional difficulties.

> As was apparent at trial this was the trial strategy utilized by Attorney Shyavitz in representing defendant Fletcher. This was not only a wise tactical choice, it was practically the only defense available in such circumstances. The defense was unable to unearth any motive on behalf of the alleged victim to lie. Thus, it was best to establish that the alleged victim was not credible, was confused as to the date of any social interaction with the defendants, and suffered from a distorted sense of reality. This trial strategy was consistently followed by Attorney Shyavitz for Mr. Fletcher and by Attorney Chapman for Mr. Johnson and later, after Attorney Chapman withdrew from his representation, Attorney Kenneth

Diesenhof.[2]

The judge found that Shyavitz's behavior at a pretrial meeting was "to say the least, extreme and perhaps bizarre."[3] He also found, however, as follows:

> Defendant Fletcher also claims that he was in no way prepared by Shyavitz for trial or for his testimony at trial. This judge does not credit this portion of Fletcher's testimony. . . . A review of defendant Fletcher's testimony reveals that Shyavitz asked a series of coherent and well organized questions. Fletcher responded knowingly and without hesitation to these questions. All of the questions were well designed to fit in with the trial strategy established by Attorney Shyavitz, namely that the events could not have occurred as early as [the victim] had testified. . . . A careful review of defendant Fletcher's testimony reveals that he was well prepared for his testimony. . . . Fletcher also appeared well prepared for cross examination.

Finally, the judge found the following:

> Approximately three weeks after the conclusion of Fletcher's trial, Attorney Shyavitz was suspended from the practice of law by order of a single justice of the Supreme Judicial Court. The reason for this suspension was a pattern of neglect by Attorney Shyavitz relating to other clients' civil cases and a series of misrepresentations to those clients. Those civil matters had no relation to Attorney Shyavitz's representation of Fletcher in this criminal matter. Attorney Shyavitz was aware that he and his brother were to be suspended. Shyavitz knew this long before the actual suspension was announced or became effective. He informed Attorney Harwood of this fact and instructed him not to inform defendant Fletcher or any other client of the law firm. Harwood did not inform Fletcher of this fact and Fletcher remained unaware of the pending suspension.

> Harwood's efforts to contact Attorney Shyavitz after his suspension have proven unsuccessful.

---

[2] The trial court's findings of fact included the following footnote: "In Harwood's affidavit and his testimony during the new trial hearing, he asserted that Shyavitz was sometimes intoxicated in the office or smelled of alcohol. This judge makes no findings in this regard because these allegations are irrelevant to this case. No one claims Shyavitz was intoxicated while meeting with Fletcher or working on this case. Certainly during the trial of this matter, Attorney Shyavitz did not smell of alcohol and did not exhibit any sign of intoxication."

[3] Among other things, Shyavitz told Fletcher at that meeting that his trial strategy would be to "play it by ear"; that he would give the alleged victim a "Hungarian necktie," which he defined as cutting the victim's throat and pulling his tongue out through the opening; and waving a handgun in Fletcher's face.

On October 13, 2004, the trial judge held a further evidentiary hearing, focusing largely on the evidence concerning the farm stand.[4] On October 21, the judge issued a detailed memorandum and order denying the supplemental motion for new trial. Among other things, the judge found as follows:

> In connection with this motion, the defendants have submitted testimony and documentary evidence which establishes that defendant Johnson operated two different farm stands in Wenham, Massachusetts at two different periods of time. The fact that these two farm stand operations were not explicitly separated at trial is not surprising because they were both very similar.
>
> . . .
>
> The defendants and their counsel knew well before trial that the issue of a farm stand was likely to arise at trial and be one of the landmarks used by [the victim] in his testimony in determining when he first visited Johnson in the Hamilton/Wenham area. I fully credit the affidavit of the prosecutor, Assistant District Attorney Kathi M. Tuttman. . . . [S]he re-interviewed [the victim] some nine months before trial. The reason for this interview was that defendant Johnson's former attorney (Mr. Randy Chapman) had unearthed evidence that Mr. Johnson had not been employed at the Shane Estate as early as [the victim] had claimed. During that reinterview, [the victim] made reference to a farm stand located down the road, three minutes away, from the Shane Estate. [The victim] stated that he believed Johnson was operating that business at the time the victim was working at the Shane Estate. [The victim] also stated that he was approximately the age fourteen or fifteen at the time. The notes of this interview were promptly forwarded by A.D.A. Tuttman to Attorney Randy Chapman and Attorney Shyavitz. There is no claim that the defendants did not receive this information. Thus, both defendants knew well before trial that the key witness, [the victim], was claiming that Johnson was operating a farm stand near the Shane Estate during the period of time in which the Commonwealth claimed Johnson and Fletcher were committing sexual assaults. The defendants certainly cannot claim that they were surprised when the issue of the farm stand came up during [the victim's] testimony at the beginning of trial. The defendants have failed to demonstrate that this evidence of the farm stands is "newly discovered". On the contrary, it was known to both defendants and any corroboration could have been

[4] On October 15, 2004, the court denied Fletcher's motion to reconsider the denial of his first motion for a new trial with the following endorsement: "The more testimony this judge hears from Attorney Harwood, the less credible he becomes. I do not credit his latest affidavit. In any event, Harwood's most recent allegations do not affect this Court's overall findings of competent representation."

obtained before or during trial.

But that is not the only reason to deny this motion for new trial. The defendants' arguments, while superficially appealing, greatly exaggerate the importance of the farm stand testimony at trial. Any reasonable juror hearing the testimony at trial regarding the farm stand issue might well conclude that [the victim] did not have a clear memory of the location of the farm stand and the precise date he first met Johnson at the farm stand. After all, these events were approximately fourteen years in the past when being testified to at trial. Even had the precise dates of the opening and closing of the two respective farm stands been introduced at trial, a jury could easily conclude that Peter Johnson was operating the Dearborn Farms farm stand (as he was until after the Christmas season of 1988) at the time he first met [the victim] and at the time [the victim] was first brought to the Hamilton/Wenham area by Fletcher. This evidence actually corroborates [the victim's] testimony. The two farm stands could easily be confused.[5]

At most, this evidence would have been offered as simply further evidence to impeach the credibility of [the victim]. Although [the victim] was obviously the key witness at this trial, both defendants had more potent ammunition to use against [the victim] other than his confusion about farm stands.

On appeal to the Massachusetts Appeals Court, Fletcher raised three claims: (1) that he was deprived of his Sixth Amendment right to the effective assistance of counsel during pre-trial preparation and at trial; (2) that the trial court's exclusion of evidence that the victim had failed to disclose abuse by the petitioner in circumstances when he naturally would have done so deprived him of his Sixth Amendment right to confront his accuser; and (3) that the amendment of the indictments deprived him of his constitutional right to be indicted by a grand jury. On March 2, 2006, in a memorandum and order, the Appeals Court affirmed the rape

_____

[5] The trial court's opinion included the following footnote: "The defendants complain that their trial counsel's failure to investigate or highlight the farm stand evidence constitutes ineffective assistance of counsel. This argument exaggerates the importance of the farm stand evidence. According to defendant Johnson's evidence, Johnson did operate a farm stand in Wenham relatively near the Shane Estate in 1988. Co-defendant Fletcher was familiar with the farm stand. This is the same period of time that the victim testified he recalled being driven by Fletcher to a farm stand operated by Johnson. Whether it was a farm stand 1 mile or 3 miles away from the Shane Estate would make little difference. The victim was unsure whether Johnson had yet started work at the Shane Estate. The focus on the two similar farm stands makes a mountain out of a mole hill. . . . ."

conviction and the denials of his motions for a new trial.  *Fletcher*, 2006 WL 508722.[6]

Fletcher then made an Application for Leave to Obtain Further Appellate Review ("ALOFAR") to the Massachusetts Supreme Judicial Court.  In his application, he raised only two of the three claims he had made to the Appeals Court:  (1) that trial counsel's alleged shortcomings in preparing for trial and at trial deprived him of the effective assistance of trial counsel and (2) that the trial court violated his right to confront his accuser by excluding evidence that the victim had disclosed prior abuse by another but not the abuse by the petitioner.  On May 1, 2006, the SJC denied the application.  *Commonwealth v. Fletcher*, 446 Mass. 1107, 846 N.E.2d 780 (2006).  Fletcher did not seek certiorari to the United States Supreme Court.

## III.    Analysis

### A.    Standard of Review

Federal habeas corpus review of a claim previously adjudicated on the merits by the state courts is both limited and highly deferential.  *Harrington v. Richter*, 131 S. Ct. 770, 780 (2011); *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010); *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).  A federal court may not grant a writ of habeas corpus on a claim that was adjudicated on the merits in state court unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1), (2).

### 1.    Contrary to or Unreasonable Application of Federal Law

---

[6] On March 16, 2006, Fletcher moved to reconsider, but the Appeals Court denied the motion.

Petitioner bears the burden of showing that the state court decision was contrary to or involved an unreasonable application of clearly established law. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011) (citing *Woodford*, 537 U.S. at 25).

A state-court decision is "contrary to" clearly established federal law if it (1) applies a rule that contradicts the governing law set forth in the Court's cases or (2) resolves a case differently from the Court on a set of materially indistinguishable facts. *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). In either scenario, the state-court decision must be "substantially different," "diametrically different," "opposite in character or nature," or "mutually opposed" to clearly established Supreme Court precedent. *Williams*, 529 U.S. at 405.

A state-court decision involves an "unreasonable application" of federal law if the state court identified the correct governing legal principle from the Supreme Court's decisions, but applied it in an objectively unreasonable manner. *See Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003) (citing *Williams*, 529 U.S. at 409). The Supreme Court has cautioned that "[a]n unreasonable application of federal law is different from an incorrect application of federal law." *Williams*, 529 U.S. at 365. The state court's application of federal law must be "more than incorrect or erroneous." *Lockyer*, 538 U.S. at 75 (citing *Williams*, 529 U.S. at 409, 410, 412); *see also Kibbe v. DuBois*, 269 F.3d 26, 35 (1st Cir. 2001); *Teti v. Bender*, 507 F.3d 50, 57 (1st Cir. 2007) ("A decision can still be reasonable even if the reviewing court thinks it is wrong; 'unreasonable' here means something more than incorrect or erroneous."). It must be unreasonable, which is "'a substantially higher threshold' for obtaining relief than de novo review." *Renico*, 130 S. Ct. at 1862 (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

If it is "a close question whether the state decision is in error, then the state decision cannot be an unreasonable application." *McCambridge v. Hall*, 303 F.3d 24, 36 (1st Cir. 2002).

A claim of ineffective assistance of counsel presents a mixed question of law and fact. *Teti*, 507 F.3d at 57. Such a claim is therefore normally reviewed under § 2254(d)(1) to determine whether the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law. *See id.* (citing *Williams*, 529 U.S. at 409).

## 2. Unreasonable Determination of Facts

Section 2254 also provides that a writ of habeas corpus may be granted if the state court's decision was "based on an unreasonable determination of the facts in light of the evidence presented . . . ." 28 U.S.C. § 2254(d)(2). Section 2254(e)(1), in turn, provides that any factual determination made by a state court is entitled to a presumption of correctness. 28 U.S.C. § 2254(e)(1); *see Gunter v. Maloney*, 291 F.3d 74, 76 (1st Cir. 2002); *Sanna v. DiPaolo*, 265 F.3d 1, 7 (1st Cir. 2001).

> The relationship between § 2254(d)(2) and § 2254(e)(1), both of which apply to state court fact determinations, has caused some confusion. The Supreme Court has suggested that § 2254(e)(1) applies to determinations of factual issues, rather than decisions, while § 2254(d)(2) applies to the granting of habeas relief itself. That is, under this approach, § 2254(d)(2)'s reasonableness standard would apply to the final decision reached by the state court on a determinative factual question, while § 2254(e)(1)'s presumption of correctness would apply to the individual factfindings, which might underlie the state court's final decision or which might be determinative of new legal issues considered by the habeas court.

*Teti*, 507 F.3d at 57-58 (citations and internal quotations omitted).

The presumption of correctness under § 2254(e)(1) applies to factual determinations made by state trial and appellate courts, as well as to any factual findings that are implicit in the state courts' rulings. *Teti*, 507 F.3d at 58-59; *see Parke v. Riley*, 506 U.S. 20, 35 (1992)

(presumption of correctness applies to "inferences properly drawn from [historical] facts").

A habeas petitioner "ha[s] the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

### B. The Claim of Ineffective Assistance of Counsel

Petitioner here contends that his trial counsel was constitutionally ineffective because counsel failed to prepare adequately for trial, failed to utilize certain psychiatric evidence, and failed to investigate and utilize certain exculpatory evidence concerning the location of farm stands.

Claims asserting ineffective assistance of counsel under the Sixth Amendment must satisfy the two-part test of *Strickland v. Washington*, 466 U.S. 668 (1984).  To establish ineffective assistance, a petitioner must establish both (1) that his counsel provided deficient assistance and (2) that he suffered prejudice as a result.  *Id.* at 687.

The first prong of the *Strickland* test requires petitioner to demonstrate that his counsel's performance fell below an objective standard of reasonableness.  Counsel is "strongly presumed" to have rendered adequate assistance and to have exercised reasonable professional judgment in rendering significant decisions.  *Harrington*, 131 S. Ct. at 787 (citing *Strickland*, 466 U.S. at 688-89); *see also Genius v. Pepe*, 147 F.3d 64, 66 (1st Cir. 1998) ("counsel's judgments in formulating the defense strategy are entitled to substantial deference").  A petitioner may overcome this presumption by demonstrating that counsel's alleged errors were so serious that his performance "fell below an objective standard of reasonableness under the circumstances." *Sleeper v. Spencer*, 510 F.3d 32, 38 (1st Cir. 2007) (citing *Strickland*, 466 U.S. at 687-90); *see also Lynch v. Ficco*, 438 F.3d 35, 49 (1st Cir. 2006).

The Sixth Amendment does not guarantee either a perfect or a successful defense. *See Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (the "Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight"). "It is only where, given the facts at the time, counsel's choice was so patently unreasonable that no competent attorney could have made it, that the ineffective assistance prong is satisfied." *Knight v. Spencer*, 447 F.3d 6, 15 (1st Cir. 2006) (quotations omitted); *see also Epsom v. Hall*, 330 F.3d 49, 54 (1st Cir. 2003) ("Trial lawyers make countless tactical choices and unless the net reckoning is 'patently unreasonable,' counsel's judgment is not constitutionally defective").

The second prong of the *Strickland* test requires petitioner to show that counsel's deficient performance resulted in "prejudice"—that is, that "counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result was reliable." *Strickland*, 466 U.S. at 687. Stated differently, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *Sleeper*, 510 F.3d at 39.

The Supreme Court has noted that "[s]urmounting *Strickland*'s high bar is never . . . easy." *Harrington*, 131 S. Ct. at 788, quoting *Padilla v. Kentucky*, 130 S. Ct. 1473, 1485 (2010).

> Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is even more difficult, since both standards are "highly deferential," 466 U.S. at 689, 104 S.Ct. 2052, and since Strickland's general standard has a substantial range of reasonable applications. The question under § 2254(d) is not whether counsel's actions were reasonable, but whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

*Harrington*, 131 S. Ct. at 788.

1.      **<u>Trial Preparation</u>**

Petitioner first asserts a number of generalized claims that his counsel was ineffective in trial preparation and performance.  As noted above, the trial judge undertook a detailed examination of the record and determined that petitioner's counsel's performance was not ineffective within the meaning of *Strickland*.  More specifically, the trial court found that counsel had pursued a reasonable trial strategy and had adequately prepared both petitioner and himself for the trial.  The Appeals Court, "[h]aving carefully reviewed the entire record," affirmed the trial court's decision that these "claims lack substance."  *Fletcher*, 2006 WL 508722, at *5.

The state courts identified the appropriate legal standard and applied that standard reasonably to the facts of the case.  This Court identifies no basis under 28 U.S.C. §§ 2254(d)(1) or (d)(2) to overturn that decision.

2.      **<u>The Psychiatric Evidence</u>**

Petitioner next contends that counsel failed to utilize certain psychiatric evidence, and that the failure constituted ineffective assistance.  Specifically, petitioner argues that during cross-examination and closing arguments, his counsel failed to emphasize a key portion of the victim's psychiatric records, failed to use evidence from those records generally, and "was simply not in command of the evidence."  (Pet'r's Br. at 14-17, 17).  The key passage at issue was in the records of the victim's 1991 hospitalization:  "[t]his patient distorts reality to an extreme degree . . . which is likely to be disabling for him."  *Id.* at 2.

At the first prong of the *Strickland* test, the Appeals Court noted that counsel's failure to use that evidence "might be viewed in the abstract as presumptively questionable behavior,

considering his defense strategy . . . .  However, in the absence of any evidence from [counsel] as to his tactical or strategic reasons for his challenged conduct, it is next to impossible to make the requisite case-specific evaluation of his trial judgments." *Fletcher*, 2006 WL 508722, at *2. Petitioner asserts that the Appeals Court, by requiring evidence about counsel's tactical or strategic reasons, has erected a standard that is "virtually impossible" to meet when the attorney "cannot be reached or refuses to cooperate."  (Pet'r's Br. at 14).[7]  It is unnecessary, however, to decide the merits of petitioner's argument on this issue, because the Appeals Court proceeded to evaluate petitioner's claim under *Strickland*'s "prejudice" prong.

The Appeals Court concluded that petitioner "did not suffer perceptible prejudice by [the] omission [of the psychiatric record from the closing argument]."  *Fletcher*, 2006 WL 508722, at *2.  It gave four specific reasons for that decision.  First, it noted that the key portion of the victim's psychiatric records "was in evidence," "was with the jury at all times during their deliberations," and was among "only ten documents admitted in evidence, making it extremely unlikely that this document would be overlooked . . . ." *Id.* at *3.  Second, although the hospital records were not significantly utilized by petitioner's counsel, they were "specifically referred" to as exculpatory by Johnson's attorney.  *Id.*[8]  Third, while the notation in the psychiatric records

---

[7] The Appeals Court may have somewhat overstated the difficulty of obtaining evidence concerning counsel's trial strategy if counsel was unavailable.  Nonetheless, for the reasons stated below, the issue need not be resolved.

[8] The Appeals Court also noted that the "prosecutor explicitly urged the jurors 'to pay very close attention' to [the psychiatric records], because the bulk of them would show that the victim was not 'out of touch with reality' as the defense had tried to establish."  Petitioner argues that "the notion that [petitioner's] right to counsel could even vaguely be met by the *prosecutor's* closing argument . . . gives too short shrift to the Sixth Amendment." ( *Id.*) (emphasis in original).  The question before this Court is not whether the state court's decision was incorrect, but whether that decision was contrary to or an unreasonable application of clearly established federal law.  Petitioner has not shown that federal law as to that issue—that is, whether a prosecutor's closing argument could ever mitigate prejudice resulting from ineffective assistance of counsel—is clearly established.  Furthermore, and, in any event, there is no obvious reason why actual prejudice to defendant caused by his own counsel's ineffectiveness could not be mitigated by actions taken by the prosecution.

could have damaged the victim's credibility, the significance of that notation was reduced by a number of other notations from the same record that bolstered the victim's credibility. *Id.* Fourth, this particular psychiatric record was the result of testing that occurred "well outside the period of the indictment and over ten years prior to trial, further diluting the substance of that observation." *Id.*[9]

Petitioner questions the reasoning used by the Appeals Court in reaching its conclusions. Petitioner contends that "the defendant's entitlement under the Sixth Amendment to a closing which argues the significance of the evidence is not met by the mere admission of evidence . . . ." (Pet'r's Br. at 16). However, petitioner has cited to no federal law clearly establishing his position—for example, he cites no case law holding that prejudice must be found where counsel's closing argument did not refer to a potentially important piece of evidence. Petitioner's cited precedents—*Herring v. New York*, 422 U.S. 853 (1975), and *Commonwealth v. Farley*, 432 Mass. 153 (2000)—are not directly on point. *Herring* stands for the proposition that defendants have a constitutional right to make a closing argument. 422 U.S. at 863. *Farley* (a state decision) stands for the proposition that defense counsel's utter failure to develop a defense through investigation, testing, cross-examination, and closing, may constitute ineffective assistance. 432 Mass. at 156-57. Neither case would require reversal here based on the failure to argue the significance of a single piece of evidence, even a potentially important one. And unlike the circumstances presented in those cases, petitioner's counsel was not denied the right

---

[9] Petitioner contends that although the psychiatric testing occurred outside the period of the indictment, "it related to a period when the [victim] claimed that he was working at the Shane estate and was still involved with the defendants." (*Id.* at 17). However, petitioner ignores the fact that the victim testified that he did not understand that the conduct was wrong until years had passed. *Fletcher*, 2006 WL 508722, at *5. This testimony further underscores the Appeals Court's point; the import of the evidence is weakened by its age. *Id.* at *3.

to make a closing argument, and the trial judge determined that counsel had adequately developed the strongest (and, practically speaking, only) defense available.

The Appeals Court thought that counsel's failure to use the psychiatric evidence was questionable at best. This Court certainly agrees. But that is not enough to satisfy the *Strickland* test; the petitioner must show actual prejudice. The Appeals Court concluded that there was no reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Fletcher*, 2006 WL 508722, at *2; *see also Strickland*, 466 U.S. at 694. And the hurdle the petitioner must surmount in this Court is an even higher one: again, he must show either (1) that the state-court decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or (2) that the decision was based on an unreasonable determination of the facts. Petitioner cannot overcome that high hurdle. The decision of the Appeals Court interpreting *Strickland* and applying it to the facts was not unreasonable, and therefore habeas relief cannot be granted on the basis of the failure to use the psychiatric evidence.

### 3. The Farm Stand Evidence

Petitioner further contends that his counsel's failure to investigate and utilize the farm stand evidence constituted ineffective assistance of counsel. According to petitioner, this evidence "proved . . . that the accuser's testimony . . . was years off the mark," and "would have sealed a verdict of not guilty on the Hamilton counts and would very likely have changed the outcome of the Haverhill counts as well." (Pet'r's Br., 11, 12). Petitioner's argument arises out of the victim's testimony about two farm stands and evidence about those stands that surfaced after the trial. The victim testified at trial that on his first visit to the Shane Estate he visited a

farm stand where co-defendant Johnson was working. (*Id.* at 12). According to petitioner, the victim's testimony unequivocally refers to the Cabot farm stand. After the trial, evidence established that the Cabot farm stand did not open until the victim was over the age of sixteen. (*Id.*). Thus, petitioner's theory suggests that none of the sexual conduct alleged to have occurred at the Shane Estate (the Hamilton counts) could have been criminal.

The Appeals Court affirmed the trial court's finding that the failure to investigate and utilize this evidence did not constitute ineffective assistance of counsel. As the Appeals Court explained, "[e]ven if we were to assume that [petitioner's counsel] was ineffective in failing to investigate the facts surrounding the farm stand testimony and to press this issue more strenuously at trial," petitioner was not prejudiced. *Fletcher*, 2006 WL 508722, at *4. In support of this conclusion, the Appeals Court identified two primary problems with petitioner's argument. *Id.*, at *3-4. First, "the victim's recollection of the farm stand he visited was concededly hazy, and he equivocated as to whether he went to the farm stand the first time he visited the Shane Estate. *Id.*, at *3. "Second, the farm stands could easily be confused, particularly considering the lengthy passage of time between the events at issue and the trial." *Id.*, at *4. In support of this second point, the Appeals Court noted that the two farm stands were both close to the Shane Estate, in the same town, and next to main roads. *Id.* Moreover, they sold the same types of goods, and operated during the same months of the year out of similar structures. *Id.* The Appeals Court acknowledged the victim's testimony cited by petitioner, but determined that the testimony was "easily explained" and "did not exculpate" petitioner. *Id.*[10] The Appeals Court concluded that the evidence "could not reasonably be deemed to have

---

[10] The victim testified that the farm stand was "down the street from" the Shane Estate, and "that he had never heard of Dearborn Farm," the location of the second farm stand.

affected [the jury's] verdicts." *Id.*

Petitioner asserts that the reasoning employed by the Appeals Court is based on a number of factual errors. First, petitioner contends that the victim did not, in fact, equivocate about going to a farm stand on his first visit to the Shane Estate. Rather, the victim's later testimony reaffirmed that fact, and he equivocated only insofar as he could not remember if, on his first visit to the Shane Estate, he went first to the farm stand and then to the estate, or vice versa. (Kempthorne Letter on Pet'r's Behalf at 2).[11] Second, petitioner contends that both the trial court and the Appeals Court confused the two farm stands in their respective statements of facts. (Pet'r's Br. at 12). The relevant portion of the Appeals Court's decision states:

> [t]he confusion over this testimony stems from the fact that Johnson operated, at different times and different locations, two similar farm stands: one at Dearborn Farm in Wenham, about one mile from the Shane Estate, from 1986 to 1988, and another at Cabot Farm in Wenham, about three miles from the Shane Estate, beginning in September 1992.

*Fletcher*, 2006 WL 508722, at *3. As respondent conceded, this statement was in error; the distances between the respective farm stands and the Shane Estate were reversed. (Pet'r's Br. at 9 n. 6). Petitioner asserts that the Court's apparent reliance on this erroneous factual information informed its decision. (*Id.* at 12).

Petitioner's allegations of factual error raise some question as to whether this claim is best analyzed under § 2254(d)(1) or § 2254(d)(2).[12] "[D]eterminations of 'basic, primary, or

---

[11] The Appeals Court also stated that the victim testified only once about going to the farm stand on his first visit to the Shane Estate. Petitioner asserts that this, too, is incorrect, and that the victim testified twice to that effect.

[12] Again, petitioner has the burden of overcoming the presumption of correctness awarded to the state court's factual determinations. 28 U.S.C. § 2254(e)(1). Petitioner's second correction, concerning the distances between the farm stands and the estate, appears to be supported by clear and convincing evidence. In oral argument and in a letter to the clerk of the Appeals Court, respondent conceded that their representation of this fact, adopted by the state courts, was erroneous. Petitioner's first correction, concerning whether or not the victim equivocated about his first visit to the farm stand, is not as clearly established. Petitioner offers a plausible reading of the

historical facts'" are analyzed under 2254(d)(2). *Ouber v. Guarino*, 293 F.3d 19, 27 (1st Cir. 2002) (quoting *Sanna v. Dipaolo*, 265 F.3d 1, 7 (1st Cir. 2001)). "Inferences, characterizations of the facts, and mixed fact/law conclusions" are more appropriately analyzed under the "unreasonable application" prong of section 2254(d)(1). *Ouber*, 293 F.3d at 27. "Inasmuch as 'both the performance and the prejudice components of the ineffectiveness inquiry are mixed questions of law and fact' for the purposes of federal habeas review," § 2254(d)(2) is of limited utility in this case. *Id.* (quoting *Strickland*, 466 U.S. at 698).[13]

Even assuming that petitioner has satisfied the burden imposed by § 2254(e)(1) and crediting petitioner's factual corrections, this Court is unable to conclude that the Appeals Court's decision was an unreasonable application of federal law. *See* 28 U.S.C. § 2254(d)(1).[14] Although petitioner's factual corrections certainly undermine the basis of the Appeals Court's first argument (that the victim's testimony was equivocal), its second argument (that any discrepancy was easily explained and therefore not exculpatory) remains valid. As outlined above, the Appeals Court detailed the similarities between the two farm stands, and commented on the amount of time that had elapsed between the events at issue in the case and the trial. The court then arrived at its conclusion:

> That the victim was somewhat confused about a farm stand he had visited over

---

testimony, but has not adequately shown why the Appeals Court's understanding of that same testimony is not also a valid interpretation.

[13] Under § 2254(d)(2), this Court would reach the same conclusion for similar reasons. The core of the Appeals Court's reasoning was not "based" on any of the erroneous factual findings to which petitioner refers. Rather, their decision was based on two primary factors: (1) the confusing nature of the farm-stand evidence that resulted from the similarities between the two stands; and (2) the long passage of time between the events at issue and the trial. These factual determinations were entirely supported by the evidence.

[14] Petitioner does not contend that the Appeals Court's decision identified the incorrect legal standard or was contrary to federal law. 28 U.S.C. § 2254(d)(1).

> ten years earlier, when two very similar farm stands were operated by one of the defendants, would not have been surprising to the jury and could not reasonably be deemed to have affected their verdicts.

*Fletcher*, 2006 WL 508722, at *4. While the reversal of the location of the farm stands may have rendered the victim's testimony incrementally less clear, or caused the evidence to appear incrementally less exculpatory, it did not undermine the Appeals Court's conclusion to the point that its decision must be deemed unreasonable. The evidence establishing the similarity of the two farm stands and the long passage of time remains unaffected by petitioner's factual corrections.

The standard erected by the statute "allows state courts 'some room for mistakes,' such as imprecise factual descriptions. *Brown v. Ruane*, 630 F.3d 62, 67 n.7 (1st Cir. 2011) (quoting *Hurtado v. Tucker*, 245 F.3d 7, 12 (1st Cir. 2001)). Accounting for petitioner's factual corrections, this Court acknowledges that the issue is certainly less clear-cut and more difficult than the Appeals Court's decision conveys. However, the question that this Court must answer is "whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." *Harrington*, 131 S. Ct. at 788. Because the Appeals Court's factual errors did not significantly undermine the thrust of its reasoning, this Court is unable to say that the court's decision concerning the farm stand evidence was unreasonable under § 2254(d)(1).[15]

## C.     The Confrontation Clause Claim

---

[15] Petitioner also contends, in the context of the farm stand issue, that the state courts "misapplied the prejudice prong of the [*Strickland*] test." (Petitioner's Brief at 13). Drawing on language from the state court decisions, petitioner asserts that "[t]he test is not . . .whether the evidence would have compelled a different result or whether the Commonwealth could have tried to explain the evidence away. Rather, the test is whether counsel's failure deprived the defendant of a meaningful defense, or so prejudiced the defendant that the outcome of the proceeding was fundamentally unfair. The new evidence plainly raised a reasonable probability of a different jury verdict . . . ." (*Id.* at 13-14) (citations omitted). Petitioner identifies the correct legal standard, but fails to recognize that the Appeals Court ruling applied that standard. The Appeals Court expressly stated that the evidence "could not reasonably be deemed to have affected [the jury's] verdicts." Petitioner's argument is thus without merit.

Petitioner further contends that his Sixth Amendment right of confrontation was violated because the trial judge precluded cross-examination of the victim regarding the victim's prior reported sexual abuse, unrelated to petitioner, that the victim suffered when he was between five and eight years old.[16] Relying on the state rape-shield statute, Mass. Gen. Laws ch. 233, § 21B, the trial judge excluded this line of inquiry, concluding that to allow it would be to "eviscerate" the statute.[17] The Appeals Court found no error and no deprivation of petitioner's Sixth Amendment rights.

Under the Confrontation Clause of the Sixth Amendment, a defendant has a right to conduct reasonable or otherwise appropriate cross-examination to expose facts from which the jury may draw inferences relating to a witness's reliability. *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974); *Olden v. Kentucky*, 488 U.S. 227, 231 (1988) (per curiam) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986)). Cross-examination may attempt to show "that the witness' character is such that he would be less likely than the average trustworthy citizen to be truthful in his testimony" or it may "reveal[] possible biases, prejudices, or ulterior motives." *Davis v. Alaska*, 415 U.S. 308, 316 (1974). However, "[c]ourts typically afford cross-examination aimed at bias, ulterior motives, and the like greater protection than general credibility attacks." *Barresi v. Maloney*, 273 F. Supp. 2d. 144, 151 (D. Mass. 2003); s*ee also Davis*, 415 U.S. at 316.

---

[16] To the extent that petitioner argues that the Appeals Court misapplied the state rape-shield statute, that claim (which arises solely a matter of state law) is not cognizable on federal habeas review. *See Evans v. Verdini*, 466 F.3d 141, 145 (1st Cir. 2006).

[17] The Massachusetts rape-shield statute, Mass. Gen. Laws ch. 233, § 21B, has a procedural requirement that a defendant must bring a pretrial motion to admit evidence that would otherwise be excluded by the statute. Both the trial judge and the Appeals Court noted that defendant failed to follow the rule. The Appeals Court stated that it could rule against petitioner on this claim because of his procedural default, but elected to discuss the "substance" of his claims. *Fletcher*, 2006 WL 508722, at *5 n. 7. In this circumstance, the Appeals Court decided the issue on the merits, and its determination is entitled to a deferential standard of review. *See Yeboah-Sefah v. Ficco*, 556 F.3d 53, 66 (1st Cir. 2009), quoting *Teti*, 507 F.3d at 56-57.

A rape-shield statute may implicate the Sixth Amendment if it diminishes a defendant's ability to confront adverse witnesses, but such a statute is not *per se* unconstitutional. *Michigan v. Lucas*, 500 U.S. 145, 149 (1991). "[T]he right to present relevant testimony is not without limitation. The right 'may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.'" *Rock v. Arkansas*, 483 U.S. 44, 55 (1987) (citing *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973)). "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall*, 475 U.S. at 679; *see also Lucas*, 500 U.S. at 149. However, restrictions on a defendant's confrontation right "may not be arbitrary or disproportionate to the purposes they are designed to serve." *Lucas*, 500 U.S. at 151 (citing *Rock*, 483 U.S. at 56).

Again, this Court must decide if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The principal relevant precedent appears to be *Olden v. Kentucky*, 488 U.S. 227 (1988). *See Dolinger v. Hall*, 302 F.3d 5, 9, (1st Cir. 2002); *see also Barresi*, 273 F. Supp 2d. at 152. In *Olden*, the Supreme Court found a violation of the Sixth Amendment where the trial court prevented the petitioner from cross-examining the complainant about her cohabitation with her boyfriend. *Olden*, 488 U.S. at 230. The petitioner's theory was that the complainant had fabricated the rape allegation in order to protect her relationship with her boyfriend. *Id.* Although the evidence was not barred by the state rape-shield statute, the Kentucky Court of Appeals upheld the exclusion of the cohabitation evidence

out of fear that the complainant would be subject to "extreme prejudice" because claimant was a white woman and her boyfriend was a black man. *Id.* at 230-31. The Supreme Court reversed and deemed the restriction excessive because it denied defendant the opportunity to show that complainant had a possible motive to lie. *Id.* at 232.

This Court is unable to say that the Appeals Court's decision regarding the present case is contrary to *Olden*, or involves an unreasonable application of its standard. *See Early*, 537 U.S. at 8 (quoting *Williams*, 529 U.S. at 405) (a state-court decision is "contrary to" clearly established federal law if it (1) applies a rule that contradicts the governing law set forth in the Court's cases, or (2) resolves a case differently from the Court on a set of materially indistinguishable facts). *Olden* does not set out any bright-line test, but instead requires a "case-and-fact-specific balancing test." *Dolinger*, 302 F.3d at 9. Thus, *Olden* allows lower courts "to take account of such factors as 'harassment, prejudice, confusion of the issues, the [witness's] safety, or interrogation that [would be] repetitive or only marginally relevant.'" *Olden*, 488 U.S. at 232 (quoting *Van Arsdall*, 475 U.S. at 679). The Appeals Court identified the correct legal standard and underwent a balancing exercise that comports with *Olden*. Furthermore, this case is factually distinguishable from *Olden*. Unlike in *Olden*, petitioner's cross-examination in the present case *was* barred by a state rape-shield statute. *Fletcher*, 2006 WL 508722, at *6; *see also Dolinger*, 302 F.3d at 9-10. Here, petitioner's cross-examination evidence was not intended to show that complainant had motive to lie, but rather to "cast[] doubt on the victim's veracity or memory." *Fletcher*, 2006 WL 508722, at *7.[18]

---

[18] Nor was petitioner's cross-examination evidence intended to show that the victim had sexual knowledge that enabled him to describe the alleged sexual acts, *see Ellsworth v. Warden*, 333 F.3d 1, 7 (1st Cir. 2003), nor to show that the victim had made false allegations in the past, *White v. Coplan*, 399 F.3d 18, 24 (1st Cir. 2005).

"As the Appeals Court 'identifie[d] the correct governing legal principle from [the Supreme] Court's decisions,' we need only inquire as to whether it 'unreasonably applie[d] that principle to the facts.'" *Dolinger*, 302 F.3d at 10 (quoting *Williams*, 529 U.S. at 412-13). The Appeals Court first analyzed the relevance of the evidence at issue to petitioner's case. It noted that the trial judge allowed petitioner "to impeach the victim as to his failure to disclose abuse by the defendants to any mental health professionals for many years, and the defendants vigorously did so." *Fletcher*, 2006 WL 508722, at *7. Furthermore, it found petitioner's theory regarding the import of the evidence to be "entirely speculative" because "there was no reason to assume that a teenager having consensual sex with an adult would view that activity in the same way he regarded the coerced sexual abuse he had suffered as a child of tender years unable to consent, or that such a person would naturally disclose the later behavior to medical professionals." *Id.* In sum, the Appeals Court determined that "the value of the testimony was only minimally relevant to the defendant's case . . . ." *Id.*

Next, the Appeals Court expressed concern that the evidence might "cause unnecessary embarrassment to the victim" and "might deflect the attention of the jury from the central issues in the trial." Its decision to uphold the trial judge's exclusion of evidence was clearly based on a number of the *Olden* factors, namely, "harassment, . . . confusion of the issues, . . . [and] interrogation that [would be] repetitive or only marginally relevant.'" *Olden*, 488 U.S. at 232 (quoting *Van Arsdall*, 475 U.S. at 679). As this application of the *Olden* standard was entirely

_____

"While Supreme Court holdings that were clearly established at the time of the state court proceedings form the primary basis for determining whether a decision was an unreasonable application of clearly established federal law, factually similar cases from lower federal courts provide 'a valuable reference point when the relevant Supreme Court rule is broad and applies to a kaleidoscopic array of fact patterns.'" *Barresi*, 273 F. Supp. 2d at 149 (quoting *Rashad v. Walsh*, 300 F.3d 27, 35 (1st Cir. 2002)).

reasonable, this Court is unable to say that the Appeals Court decision was contrary to an unreasonable application of clearly established federal law.

**IV.**    **Conclusion**

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.

**So Ordered.**

 /s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated:  July 29, 2011